## F.M. Brown's Sons Inc. v. Wilson School District

C.P. of Berks County, no. 98-13613.

*Philip J. Edwards,* for plaintiff.
*Richard E. Fehling,* for defendant.

SCHAEFFER, *S.J.,* August 1, 2000—This declaratory judgment action arises out of a dispute over whether the plaintiff, F.M. Brown's Sons Inc., is obligated to pay a business privilege tax to defendant, the Wilson School District.

On October 22, 1998, Brown's was sent a notice of a business privilege tax audit, computing taxes due Wilson going back to 1992. On December 18, 1998, Brown's filed this declaratory judgment action, asserting that revenue from Brown's birdseed and wildlife feed operations, at two locations within Wilson's boundaries in Sinking Spring Borough, Berks County, Pennsylvania, is exempt from and not subject to Wilson's business privilege tax because its operations constitute manufacturing. Wilson contends that the exemption does not apply to Brown's

operations because it does not change the original product, seed and grain, into any new, different or useful article.

After a non-jury trial, we make the following findings of fact:

## FINDINGS OF FACT

(1) Plaintiff, F.M. Brown's Sons Inc., is a business corporation incorporated under the laws of the Commonwealth of Pennsylvania with its registered office at 205 Woodrow Avenue, Sinking Spring, Berks County, Pennsylvania.

(2) Defendant, the Wilson School District, is a public school district with its administrative offices located at 2601 Grandview Boulevard, West Lawn, Berks County, Pennsylvania.

(3) Plaintiff was audited around 1987 or 1988 by Mr. Lilierose, Wilson's tax auditor at the time, who toured the 205 Woodrow Avenue facility.

(4) By letter to Wilson, dated January 14, 1988, plaintiff, by its secretary Harvey J. Brown, requested a determination that plaintiff was exempt from paying Wilson's business privilege tax.

(5) By letter dated April 22, 1988, Wilson, by its assistant to the business manager, Charlotte G. Auman, stated, "Our solicitor has reviewed your request for exemption in regards to the mercantile tax. It is his opinion that the portion of F.M. Brown's operations that are involved with 'milling' are exempt from the Wilson School District's mercantile tax."

(6) Brown's thereafter did not pay the BPT on any of its birdseed or small animal feed.

(7) In February 1998, an auditor to Wilson, Mr. Susko, toured Brown's facility and reviewed its financial records.

(8) The BPT audit results that followed showed a balance due of tax, penalties and interest of $38,120.36 for tax years 1992 through 1997, calculated to March 21, 1999.

(9) The Wilson BPT taxes, penalties and interest owed for the years 1998, 1999 and 2000 have not yet been calculated.

(10) Wilson acknowledges that the revenue from the product sold by Brown's seed division constitutes wholesale sales revenue, subject to being taxed at the rate of 0.1 percent, rather than 0.15 percent, the latter being the rate of the Wilson BPT for retail sales.

(11) Plaintiff produces approximately 1,500 different products through its seed division.

(12) Plaintiff categorizes its feeds in four segments: wild bird, caged bird, small animal and pigeon.

(13) Across the four segments of the seed division, two general descriptions of its products cover all of the products that Brown's sells: (1) a product that contains a single seed, grain or vitamin-enhanced pellet, whether it is sold in small containers or large, bulk bags (single-source feed); and (2) a product that contains more than one seed, grain, or vitamin-enhanced pellet, whether it is sold in small containers or large, bulk bags with two, three or more different seeds, grains or pellets (multi-source feed).

(14) The vitamin-enhanced pellets that are added to the feed are produced at Brown's Birdsboro facility, which is located outside the Wilson School District.

(15) The vitamin-enhanced pellets are delivered to the Woodrow Avenue site, where they are stored in bins for use as a single-source feed or for mixing/blending as a component of the multi-source feeds.

(16) Seeds and grains are delivered to the James Street site for processing for use as a single-source feed or for mixing/blending as a component of the multi-source feeds.

(17) Upon arrival of the seeds or grain, Brown's personnel at the James Street site perform the following tests or inspections: (a) measure the moisture content of the feed; (b) measure the test-weight of the feed; (c) visually inspect the feed; and (d) smell the feed.

(18) Brown's remedies loads of feed that are too moist by drying them, remedies loads of feed that have insects by using an appropriate insecticide, and rejects loads of feed that cannot be remedied.

(19) After the testing and inspections at the James Street site, Brown's moves the seeds and grain to its Woodrow Avenue site for further processing and packaging.

(20) The seeds and grains are cleaned at the Woodrow Avenue site by being run through and over various-sized screens, which screens eliminate big detritus (such as sticks, stems and large stones) and small detritus (such as cracked/broken seeds, large dust, dirt and small stones).

(21) The seeds and grains are further cleaned at the Woodrow Avenue site by passing them through a large air-blowing/suction machine that eliminates dust and other very fine particles from the seeds and grain.

(22) The seeds and grain are then moved into storage bins, awaiting packaging as a single-source feed or mixing and blending into a multi-source feed.

(23) Single-source feed is moved into a holding tank and is then poured into a variety of packaging: (a) poly (plastic) bags with natural air; (b) poly bags with $CO_2$; (c) small paper bags; and (d) 50-pound paper bags for bulk sales.

(24) Multi-source feed is blended/mixed in batches of many hundreds of pounds and is then moved into a holding tank, from which it is poured into a variety of packaging: (a) poly (plastic) bags with natural air; (b) poly bags with $CO_2$; (c) small paper bags; and (d) 50-pound paper bags for bulk sales.

(25) The contents of the initial truckloads of product delivered to Brown's are seed and grain, uncleaned and dusty; what is packaged and sold by Brown's remains seed and grain, albeit cleaned and mixed according to formulas.

(26) Brown's cracks corn at its James Street site, which involves running the corn through rotating knives that cut the corn into small pieces which are then run over or through two screens for further cutting, then screening out dust and tiny pieces of corn which fall through into a waste area where they are removed, stored and sold.

(27) The cracked corn is then moved to one of the holding bins at the Woodrow Avenue site, where it is either packaged alone as a single-source feed or is mixed/blended with other seeds, grains or vitamin-enhanced pellets as a multi-source feed.

(28) By its letter to Brown's, dated April 22, 1988, and as a stipulation in this matter, Wilson acknowledged that the "cracking" of corn by Brown's constitutes "milling."

## DISCUSSION

The issue before the court is whether or not plaintiff's production of wild bird, caged bird, small animal and pigeon feed constitutes "manufacturing" under the provisions of the Local Tax Enabling Act and Wilson's ordinance so as to exempt the revenue derived from their sale from Wilson's business privilege tax.

Tax statutes are generally strictly construed. *Harrisburg v. School District of Harrisburg,* 675 A.2d 758, 766 n.5 (Pa. Commw. 1996), *rev'd on other grounds,* 551 Pa. 295, 710 A.2d 49 (1998). Statutes providing exemptions from taxation, however, must also be strictly construed, 1 Pa.C.S. §1928(b)(5), and it is the taxpayer's burden to prove entitlement to an exemption. *Industrial Valley Title Insurance Co. v. School District of Philadelphia,* 661 A.2d 497, 499 n.1 (Pa. Commw. 1995).

The statutory basis for the Wilson business privilege tax is the LTEA, 53 P.S. §6901 et seq. Under this act, revenue derived from manufacturing is exempt from taxation:

"(4) To levy, assess and collect a tax on goods and articles manufactured in such political subdivision or on the by-products of manufacture . . . or on the preparation or processing thereof for use or market, or any privilege, act or transaction related to the business of manufacturing . . . by manufacturers . . . with respect to the goods, articles and products of their own manufacture . . . or on any privilege, act or transaction relating to the business of processing by-products of manufacture, or on the transportation, loading, unloading or dumping or storage of such goods, articles, products or by-products." 53 P.S. §6902(4).

The Wilson business privilege tax resolution and regulations are in line with the LTEA and also exempt manufacturing from taxation:

"(5) Production and manufacture—No such tax shall be assessed and collected on goods, articles, and products, or on by-products of manufacture, . . . manufactured . . . within the district, or on the preparation or processing thereof for use or market, or on any privilege, act or transaction relating to the business of manufacturing, . . . by manufacturers, . . . with respect to the goods, articles and products of their own manufacture . . . ." Resolution, section III, c(5).

"(a) No tax shall be assessed and collected on goods, articles, products, by-products of manufacture, . . . manufactured . . . within the district, or on the preparation or processing thereof for use or market, or on any privilege act or transaction relating to the business of manufacturing . . . by manufacturers . . . with respect to the goods, articles and products of their own manufacture . . . ." Regulations, section V, 6(a).

In *Township of Muhlenberg v. Clover Farms Dairy Co.*, 665 A.2d 544 (Pa. Commw. 1995), the Commonwealth Court noted that the definition of "manufacturing" found in the relevant case law applies to all local tax ordinances enacted pursuant to the LTEA, and: "[c]onsists in the application of labor skill to material whereby the original article is changed to a new, different and useful article . . . [.] Whether or not an article is a manufactured product depends on whether or not it has gone through a substantial transformation in form, qualities and adaptability in use from the original material, so that a new article or creation has emerged . . . [.] *If there is merely a superficial change in the original*

*materials, without any substantial and well signalized transformation inform, [sic] qualities and adaptability in use, it is not a new article or new product . . . [.]" Id.* at 546, citing *Bindex Corp. v. City of Pittsburgh,* 504 Pa. 584, 587, 475 A.2d 1320, 1322 (1984). (citation omitted)

We find that the line of cases dealing with food products are analogous to the case at bar. In *Clover Farms, supra,* this court granted summary judgment to the Township of Muhlenberg based on our determination that Clover Farms was not exempt from either the township's mercantile tax or business privilege tax. The Commonwealth Court affirmed, holding that, "for a business to be classified as a manufacturer, it must meet two criteria: (1) skill, labor and science must be involved; and (2) a new, different and useful product must be created." *Id.* at 547, citing *Van Bennett Food Co. Inc. v. City of Reading,* 87 Pa. Commw. 30, 486 A.2d 1025 (1985).

Clover Farms produced three different non-dairy drinks: fruit juice, fruit drinks and iced tea. To produce the fruit juices, Clover Farms purchased squeezed fruit juice, which then had its water evaporated leaving a slurry, a frozen syrup-like material. The slurry was transported to Clover Farms, where pasteurized water was added, along with sucrose. The temperature, sugar, acid, and bacteria levels were monitored by sophisticated machines. The process for making the fruit drinks and iced tea involved the blending of pasteurized water and sucrose with powdered mixes using machines to regulate the temperature, sugar, acid and bacteria levels. The Commonwealth Court held that Clover Farms' process effected only a superficial change in the original materials and that the final product was not to be put to a use other than that which had been intended for the original

ingredients. Clover Farms began and ended with essentially the same product, viz, juice and soft drinks, and therefore, the Commonwealth Court held that Clover Farms was not a manufacturer because it did not produce a new, different and useful product. *Id.* at 547.

Thus, we must first determine whether the preparation methods used for the products at issue, birdseed and small animal feed, consist of the application of a high degree of skill, science and labor; and second, whether there has been a substantial transformation in form, qualities and adaptability in use so as to produce a new, different and useful article.

With respect to the instant case, the record indicates that the process involves buying grains of the utmost quality that contain the highest possible nutrients. The grain is shipped to Brown's facility where it is first checked for quality, moisture level and test weight. The grain is visually inspected for abnormalities and insects, then for abnormal odors. If the quality meets Brown's standards, the grain is moved to the Woodrow Avenue site where it is put through a cleaner and cleaned two ways: by air and by screenings. The clean grain is then stored in bins to await the mixing process. Corn is cut into the correct size and mixed with other ingredients to make the wild bird feed and the caged bird feed. When Brown's makes a particular type of feed, it exactly weighs, and in some instances, volume weighs the ingredients that go into the feed. The feed is then mixed and once again cleaned by air. It is cleaned by screens before it's elevated into holding tanks for packaging. Brown's then packages the feed in either paper bags or polyethylene bags with carbon dioxide added to extend the shelf life of the feed.

The number one criteria focused on for the production of wild bird feed is the attractant quality to the birds, while the caged bird feeds focus on the health of the birds and the nutritional requirements of the feed. Small animal feed focuses on the animal's nutritional needs. The labels on the products contain a guaranteed analysis of, inter alia, the minimum level of protein, fat and fiber contained in the products. The products can also contain an attractiveness chart, a general information chart on what seed preferences various species of birds have. During the blending and mixing process, both a nutritional analysis and corresponding consistent formulation are required so that each type of feed will perform to its guaranteed specifications as provided on the package labels. In some cases, the feeds are vitamin fortified. We find that formulation of these mixes requires the application of skill, science and labor.

However, as to the second requirement, the grain and seeds which are originally shipped to Brown's are not substantially changed into new and different articles. The raw grains and seeds remain essentially what they were before they were processed, mainly grains and seeds. Brown's final products are not, therefore, new and different items that would be put to a use other than that which had been intended for the original ingredients. We find that there has been no substantial transformation in form, qualities and adaptability in use so as to produce a new, different and useful article. We hold, therefore, that the process used by Brown's to make its wild bird, caged bird, small animal and pigeon feed does not constitute manufacturing, and further, that revenue derived from their sale is not exempt from Wilson's BPT.

Wilson has agreed and stipulated that the cracking of corn, and the single-source cracked corn, remains manufacturing, and revenue derived from the sale of cracked corn is exempt from its business privilege tax. Therefore, the cost of the "cracked corn" component of all birdseed and feed is entitled to be deducted from Brown's gross revenues.

## CONCLUSIONS OF LAW

(1) Statutes providing exemption from taxation must be strictly construed; it is Brown's burden to prove its entitlement to exemption from taxation under the Wilson BPT.

(2) The preparation methods used for the products at issue, birdseed and small animal feed, consist of the application of a high degree of skill, science and labor.

(3) There has been no substantial transformation in form, qualities and adaptability in said products' use so as to produce a new, different and useful article.

(4) The portion of Brown's operations that involves the cracking of corn constitutes manufacturing, thereby exempting revenue received from the sale of cracked corn from the Wilson BPT; both the revenue from the sale of the single-source cracked corn and the revenue from the cracked corn component of any cracked corn blends are exempt from the Wilson BPT.

(5) Brown's failure to allocate exempt from non-exempt revenue constitutes a waiver of its right to present any such allocations of revenues for the March 21, 1999 audit, therefore, Brown's owes to Wilson the full amount of tax set forth in the March 21, 1999 audit, plus interest at the annual rate set forth in the Wilson BPT resolution after March 21, 1999, until the amount is paid in full.

(6) Brown's owes to Wilson tax on the revenue of its seed division for 1998, 1999, 2000 and thereafter, plus any penalties and interest, subject to the right of Brown's to deduct from its taxable wholesale revenue the amount of such revenue that is derived from the sale of cracked corn. Brown is obligated to file amended tax returns for this period, showing what is owed and proving what is exempt from the Wilson BPT.

(7) Wilson did not, in its April 22, 1988 letter, declare that Brown's entire birdseed and wildlife feed operation was exempt from the Wilson BPT.

(8) The claim of Brown's that Act no. 145 of December 13, 1988, 72 P.S. §7450.533(b), prohibiting Wilson from reinstating the taxability of its birdseed and wildlife feed revenue is not supported by the evidence, and is without merit.

(9) The claim of Brown's that Wilson is estopped from taxing revenue from its birdseed and wildlife feed operations is not supported by the evidence and is without merit.

Accordingly, we enter the following decree nisi:

## DECREE NISI

And now, to wit, August 1, 2000, it is ordered and decreed that F.M. Brown's Sons Inc. is obligated to pay to the Wilson School District the entire business privilege tax assessed in the March 21, 1999 audit, plus interest and penalties, as well as the taxes, penalties and interest owed for the years 1998, 1999 and 2000, on the revenues derived from its birdseed and wildlife feed operations, in Sinking Spring Borough, Berks County, Pennsylvania, because F.M. Brown's Sons Inc.'s proc-

ess at said plant is not manufacturing that would establish an exemption from the Wilson School District Business Privilege Tax.

It is further ordered that the portion of F.M. Brown's Sons Inc.'s operation that involves the cracking of corn constitutes manufacturing and the revenue received from the sale of cracked corn and any cracked corn component of any blends of its feed are exempt from the Wilson business privilege tax. F.M. Brown's is entitled to deduct from its taxable wholesale revenue the amount of such revenue that is derived from the sale of cracked corn for the years 1998, 1999 and 2000. F.M. Brown's is obligated to file amended tax returns for this period, showing what is owed and proving what is exempt from the Wilson business privilege tax.

If no exceptions are filed to this decree nisi within 10 days from and after the date of the service of the same upon the parties thereto, this decree shall become absolute as of course.